FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2005 NOV 18  A 9: 47

U.S. DISTRICT COURT
NEW HAVEN CT

| | |
|---|---|
| **T. BARRY STEPHENS** | : CIVIL ACTION NO. |
| | : 3:01 CV 2267 (JBA) |
| Plaintiff | : |
| | : |
| v. | : |
| | : |
| **TES Franchising, L.L.C., a CT LLC.** | |
| **The Entrepreneurs' Source, Inc., a Delaware Corp.** | |
| **Terry Powell, a resident of Southbury, CT** | |
| | : |
| Defendants | : November 17, 2005 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD WITH RESPECT TO STEPHENS' COUNTER-DEMAND

### I.    PRELIMINARY STATEMENT.

This Memorandum supports Plaintiff T. Barry Stephens'[1] ("Stephens") Motion to Vacate

Arbitration Award with Respect to Stephens' Counter-Demand being concurrently filed..  That

award ("the Award") was filed in the arbitration between the Defendants, **TES Franchising, LLC**

**("TES, LLC"), The Entrepreneur's Source, Inc. ("TES, Inc.") and Terry Powell ("Powell"),**

**collectively "the TES Parties" or "TES," as the Claimants, and Stephens, as the Respondent,**

**administered by the Northeast Case Management Center of the American Arbitration**

**Association ("the Association") as Case No. 12 114 00967 01.**

The arbitration proceeding arises from enforcement of Sec. 20.01 of Stephens' TES

---

[1]Stephens' relationship with TES is that of a franchisee.  TES refers to its franchisees as "consultants."

Consultant Franchise Agreement ("Stephens' Franchise Agreement") with TES, which states, among other things, that the arbitration shall be "in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association."

This action is an example, albeit extreme, of why arbitration is often not: a less-expensive and more expeditious means of resolving disputes than litigation; a means of reducing crowded court dockets; and a fair means to all parties of resolving disputes.

After receiving Stephens' October 20, 2001, demand letter (Ex.1a) from his counsel, Mark J. Klein, of Kansas City, Missouri, with respect to certain complaints against TES, LLC and other parties, TES, LLC, filed with the Association a demand for arbitration against Stephens on or about November 13, 2001 (Ex.1b). Stephens filed this action against the TES Parties on December 5, 2001. (Doc. No. 1.) Steven Zaks concurrently filed an action in this court (Action No. 2266, the " Zaks Action") against the TES Parties alleging substantially identical claims as alleged by Stephens.. (Doc. No.1, Zaks Action.) This action and the Zaks Action were consolidated on October 3, 2002 (Doc. No. 37.)

An extensive series of filings, procedures and events[2], winding through this court and the

---

[2].That series of filings, procedures and events included: the filing by the TES Parties on May 13, 2002, of a motion to stay the litigation and compel arbitration ("Motion to Compel Arbitration") (Doc. No. 22), a ruling by this court on July 10, 2002 (Doc. No. 26) denying the TES Parties' Motion to Compel Arbitration; the filing by the TES Parties on August 7, 2002, of a motion for reconsideration of that ruling (Doc. No. 27); a ruling on August 22, 2002, denying that motion for reconsideration ((Doc. No. 31); the appeal by the TES Parties of that ruling (Notice of Interlocutory Appeal (Doc. No. 35) filed September 18, 2002; a motion to stay litigation pending appeal (Doc. No. 36) filed by the TES Parties; the denial of that motion on October 1, 2002, by endorsement; the consolidation of this action with the Zaks Action on October 3, 2002, with all consolidated filings to be filed in the Zaks Action (Doc. No. 37); the filing with the Second Circuit of Appellants' Brief and a Joint Appendix by the TES Parties on or about January 10, 2003; a dispute between the Parties concerning the appearance in that Appendix, which had been compiled by the TES Parties, of a document claimed to have been

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

United States Court of Appeals for the Second Circuit, almost entirely regarding arbitrability and related issues in the consolidated actions, occurred thereafter until this court ordered the parties to arbitrate their respective claims against each other on July 12, 2004 (Doc. No. 62, Zaks Action).

Stephens filed with the Association on or about October 11,2004, his Answering Statement and Counter-Demand against the TES Parties (Ex.2) Roy L. De Barbieri, Esquire, of New Haven, Connecticut, was appointed as Arbitrator by the Association.   Mr. DeBarbieri was an experienced attorney with over twenty-seven years of practice.  His experience included defending clients in, among other things, consumer fraud cases. He had, since 1988, served as an Association arbitrator in approximately 40 matters and had served as a panelist in, among other things, arbitrations involving major national franchisee disputes and several consumer cases.  (Biographical sketch of Mr. DeBarbieri delivered by the Association to Stephens, Ex. 3.)

On or about October 12,  2004, Stephens filed a written request with the Association to consolidate his proceeding with the separate arbitration  proceeding between Zaks and the TES Parties based on the substantial identity of the facts and issues.  (Ex. 4.)  The Arbitrator denied that motion on December 16, 2004.  (Ex. 5.)  On March 24, 2005, Stephens filed with the Association a request to reconsider  his prior request  to consolidate with the Zaks proceeding.  (Ex.6.)  The

---

filed by the TES Parties in the Zaks Action in this Court about whether that document was part of the record in the Zaks Action; a February 5, 2003, letter request by Zaks for an investigation  by this court concerning the mysterious appearance of that document in this court's files (Doc. No. 43, Zaks Action) ; the February 7, 2003 referral to  Magistrate Judge Joan G. Margolis to determine the record with respect to that document (Doc. No. 46); the filing by the Parties with the Second Circuit on or about June 23, 2003 of a Stipulation of Withdrawal of Appeal with the understanding that the court would allow the refiling of the TES Parties' Motions to Compel Arbitration and reconsider the issues (see August 21 , 2003 order, Doc. No. 57; and the refiling of the TES Parties Motion to Compel (etc.), on September 2, 2003 (Doc. No. 58, Zaks Action).

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

Arbitrator denied that request on or about April 5, 2005 (Ex.7.)    On March 2, 2005, this Court ruled, upon a joint request for clarification filed by all parties, that this Court's foregoing order compelling arbitration was intended to apply to apply to each of the defendants, specifically including the nonsignatories to the arbitration agreement, TES, Inc and Powell. (Doc. No. 65.)

A hearing was held before the Arbitrator in his offices on May 17 - 20, 2005. All parties appeared and were represented by their counsel of record in this action, Attorneys Alec Sohmer and Scott Kern for the TES Parties and Attorneys John Gale and Mark Klein for Stephens. Separate post-hearing briefs were filed by Stephens and the TES Parties with the Arbitrator on or about July 15, 2005. (Ex. 8 and 9, respectively.) Post-hearing reply briefs were subsequently filed by Stephens and the TES Parties with the Arbitrator (Ex.10 and 11, respectively).

The Arbitrator issued an award on August 18, 2005, finding: against the TES Parties on their demands against Stephens; against Stephens on his counter-demands against the TES Parties; and dividing responsibility for all Association administrative expenses and Arbitrator compensation between Stephens, on the one hand, and the TES Parties, on the other, evenly. (Ex. 12.)

Stephens now files this motion to vacate that award with respect to the denial of his counter-demands. The motion to vacate is based on the following: (1) the Arbitrator's manifest disregard of the law in applying the Connecticut Unfair Trade Practices Act ("CUTPA"), §§ 42-110a, *et seq.*, Connecticut General Statutes, in violation of well-established precedent; (2) the Arbitrator's manifest disregard of the law in applying the Florida Franchise Act, Stat. § 817.416(2)(a); and (3) the Arbitrator's evident partiality in considering the facts and the applicable law and in rendering the award.

II.    FACTS.

All of the facts stated in this Memorandum, and upon which Stephens' Motion to Vacate is based, are in the record of the subject arbitration proceeding ("the Arbitration Proceeding") or this action; provided, however, as to evidence presented to the Arbitrator, reference is made only to facts either admitted by the TES Parties in their briefs or contained in exhibits or addenda in the record.. The hearing was not transcribed. This Memorandum will present the Court a very limited review of the underlying facts. For a more comprehensive understanding of the factual claims of each Party, the Court is referred to their briefs (Exhibits 8 - 11.)

Stephens counter-demand (Ex. 2 ) adopted each of the first four counts of Stephens' Complaint (Doc. No. 1) filed in this action. His First Count alleged violations of CUTPA, in that the TES Parties made certain misrepresentations to induce him to purchase his TES franchise. His Second Count alleged fraudulent inducement. His Third Count alleged negligent misrepresentation. His Fourth Count alleged violation of the Florida Franchise Act, Fla. Stat. Ann., § 817.416, most particularly, § 817.416(2)(a), based on the deceptive use of a meaningless United States Department of Commerce survey to help convince him that the purchase of his franchise was a very safe investment.

Those misrepresentations of fact made by TES to Stephens were as follows:

1.    That TES Franchisees, like Stephens, would be able to "place" their Clients with any of the thousands of different franchises being operated in the United States (the "Franchise Inventory" Misrepresentation);

2.    That TES and its TES Franchisees provided only consulting services to their Clients that helped them "place" Clients with franchises and were not in the business of selling franchises (the "Consulting Service Misrepresentation");

3.      That TES and its TES Franchisees always acted in the best interests of their Clients, that they represent "our Clients interests above all others," that they "provide all of our Clients with the most comprehensive, objective, unbiased and meaningful advice" in the purchase of their franchise, and that they would "continually honor our commitment that * * * 'Your Success is Our Only Business'" (the "Best Interest of Clients Misrepresentation");

4.      That TES and its Consultant Franchisees used a sophisticated method of matching Clients seeking to purchase a franchise with the franchises most suitable for the Clients (the "Matching Service Misrepresentation"), based substantially on information confidentially provided by the Clients to TES and on a "proven success system, developed by our founders, who share over 40 years experience in all aspects of franchising and business success"; and

5.      That a U. S. Department of Commerce survey substantiated the claim that the purchase and operation of a franchised business was a much safer investment in comparison to the purchase and operation of an independent (nonfranchised) business (the "Franchise Safety Misrepresentation").

Stephens' claims were based, in part, on marketing materials reviewed by Stephens before he purchased his franchise: a May 20 - 24, 2000, printout of the TES Parties' Web site (Ex. 13) and a copy of an article "Franchise Business v. Independent Business" (Ex. 14, "the Ashman Article") by Richard Ashman delivered to him by the TES Parties. (Stephens' Complaint in this Action [Doc. No.1], paragraph 13; TES Parties Post-Hearing Brief [Ex. 9], page 7 and Note 2.) Certain claims were made in the Ashman Article comparing the safety of investing in a franchised business as opposed to an independent business, based on a U. S. Department of Commerce Survey.

The hearing was held May 17 - 20, 2005. At the beginning of the hearing, the Arbitrator

introduced himself, described his training and experience in arbitration, and specifically stated that he had served as an Arbitrator in at least 60 proceedings.  Subsequently the parties submitted post-hearing briefs and reply briefs, each of which was read by the Arbitrator.  (Award, Ex.12, par. 15.)

The Arbitrator found in favor of the TES Parties on all counts solely because he determined that Stephens did not reasonably rely on the misrepresentations of the TES Parties, considering the following:  that Stephens read and understood the terms and conditions of the TES Uniform Franchise Offering Circular ("UFOC") and his Franchise Agreement when he signed them; that he "was an experienced businessman with sufficient education and business acumen to make an independent judgment" as to his investment in his TES franchise; and the fact that Stephens "now *claims that he misunderstood* the intention of the TES Franchise business" (emphasis supplied)  or that his moral and ethical differences with "the general belief system of the TES Franchise business" was not the fault of the TES Parties.  (Award, Ex.12, para. 13 .)  In paragraph 1 of the Award, the Arbitrator specifically referred to the "unique relationship" between Stephens and TES, LLC, and stated that his award should not be "interpreted in any way to apply to other similar fact patterns or matters which may be in litigation or arbitration."[3]

The Arbitrator was briefed by Stephens that, under well-established Connecticut law, a CUTPA plaintiff "need not prove reliance or that the representation became part of the basis of the bargain. *Hinchcliffe v. American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 at 815 (1981)."  Stephens' Post-Trial Brief, Ex.8, p. 41.  In that brief (p. 41), Stephens also referred to the decision

---

[3]This paragraph was an obvious reference to the Zaks arbitration proceeding that Stephens sought to consolidate with his own.   Stephens had previously advised the Arbitrator in his application  to consolidate (Ex. 5) and subsequent request for reconsideration of that application (Ex. 7) of the substantial identity of the factual claims and legal issues involved in the two proceedings.

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

of this court in *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167 (D. Conn. 2000). In pages 41 through 48 of that brief, Stephens thoroughly discusses the legal standards applicable to CUTPA claims.

The TES Parties agreed with Stephens' citation of established Connecticut law that reliance is not an essential element of a CUTPA violation, but argued that:

> * * * In a case of a single individual's CUTPA claim only proof of actual reliance should be viewed as adequate proof of the required materiality of the alleged misrepresentation.

The TES Parties, however, cited no authorities whatsoever for their interpretation of the CUTPA decisions. They argued solely that the established standards for determining whether there has been a deceptive act or practice for consumers in general must be applied to a single individual's CUTPA claim. (pp. 29-30, TES Parties' Post-Hearing Brief, Ex. 9.)

Stephens, at page 57 of his post-hearing brief, stated:

> The Florida Franchise Act, Fla.Stat. § 817.416, provides that it is unlawful, when selling or establish a franchise or distributorship, for any person to "1. Intentionally to misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship." Florida Franchise Act, § 817.416(2)(a)1.

The TES Parties, at pages 34-35 of their post-hearing brief, restate the law but argue that the facts do not support a violation.

Powell admitted in his testimony that he knew that the Department of Commerce Survey (Ex. 14) distributed by the TES Parties measured only how long specific franchises were in business, but without regard to the number of franchisees who operated those franchises during those years. (TES Parties' Reply Brief, p. 4.) The TES Operations Manual (Ex. 15)[4] documents this

---

[4]Stephens will attach as an exhibit only pertinent pages of that Operations Manual rather than the entire Manual, which is about three inches thick.

admission that the Department of Commerce Survey is misleading in that it considered only whether the same business was in operation during the measured period, without regard to the number of different owners of that business.[5]  Neither the Ashman Article nor any of the other TES franchise marketing materials among the exhibits at the hearing containing the reference to Department of Commerce survey note this distinction.  The clear implication is that the purposeful intent in using these marketing materials is to misrepresent to prospective franchisees, like Stephens, the safety of purchasing a franchise, by implying that 90% of franchisees are still in business after ten years when TES knew this was not the case. [6]

As to the Franchise Inventory misrepresentation, TES required that all franchises to be

_____

[5]At page 18 of Section 4 of the TES Operations Manual, the following is stated (all emphasis is in the original document):

> How many failed business people have you seen go on to start another business?  At least a few.  Successful business people view business failures as **temporary setbacks.**
>
> We focus on **options.**  Once and forever, **know your options through self-employment.**
>
> ?? What would you do if you knew you had a **90% probability of success?**  That's franchising's success rate.  The U.S. Department of commerce's research statistics show:
> 96.2   after 3 years   REMAIN IN BUSINESS
> 95%    after 5 years
> 90%    after 10 years
> What's the rate of success for **non-franchise** business?
> 18% after 10 years, according to the U.S. Department of Commerce.
>
> Note: These figures apply to the **businesses,** not the **owners.**
> The **danger** is finding out after 12-18 months that you picked the **wrong** business.

[6]See, for example, Ex. 16a, "Could a Myth be Keeping You from Becoming a Legend" and Ex. 16b, "The F Word."

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

identified to clients as possible "matches" *must* be selected from the limited number of fact sheets in the TES Library. (TES Operations Manual, Ex.15, Sec. 7, p. 11.) TES admitted that it received from a small number of franchisors[7] who were members of a "Lead Pool" lists of the latters' own cold leads in exchange for an initial preference[8] in proposing matches to leads furnished by other members of the Lead Pool. It could disclose to these particular prospects, *if a prospect inquired*, only that their identity had been disclosed by a franchise company. No disclosure was to be made as to the fact that TES could match the prospect only with the very limited number of members of the Lead Pool. (TES Parties Post-Hearing Brief, Facts, par. 10-b, j, note 5, pp. 9 - 11; TES Parties Post-Hearing Reply Brief, p. 4 [par. I-d]; Exhibits 17, 18 and 19.)

As to the Best Interests of Client misrepresentation, Powell admitted that Cottman Transmission, Verlo Mattress Factory Stores and The Cleaning Authority, offered, through the TES Parties, incentives to its franchisees to place clients with those franchisors. (TES Parties Post-Hearing Brief, Facts, par. 10i, p. 10; Ex. 20.)

---

[7]As of October 16, 2000, the only members of the Lead Pool were Motophoto, The Maids, Great Clips, Kwik Kopy, One Hour Martinizing and Fast Signs. (Ex. 17.) By November 11, 2000, AWT, Copy Club, Copy Club West and Women's Health Boutique, had been added as Lead Pool franchisors. (Ex. 18.)

[8]The reference to "initial preference" was false. In an October 16, 2000, message (Ex. 17) to "All Consultants and Rds" from Powell and Joe Mathews (another executive of TES, LLC), they stated, on page 2:

2.    For Clients referred by the pool, you will only recommend participating lead pooling franchisors. If for some reason we cannot find a suitable recommendation from within the team of participating franchisors, we will not be able to offer other opportunities. *As we expand this program and add additional franchisors, this will become less of an issue.*

III.    **ISSUES PRESENTED.**

     A.    Did the Arbitrator manifestly disregard the law in applying CUTPA?

     B.    Did the Arbitrator manifestly disregard the law in applying § 817.416(2)(a) of the Florida Franchise Act?

     C.    Was the Arbitrator "evidently partial" in rendering the award?

IV.    **THE LAW AND ARGUMENT.**

An arbitration award may be vacated under the Federal Arbitration Act ("FAA") under the following grounds: (1) procurement of the award by corruption, fraud or undue means; (2) evident partiality or corruption; (3) refusal to hear proper evidence or to postpone the hearing for sufficient cause; and conduct by the arbitrators exceeding their powers. 9 USC § 10 (a) (1) - (4). The courts have, by decision, expanded these grounds to include: manifest disregard of the law by the arbitrator (*Wilko v. Swan*, 346 US 427, 436, 74 S Ct 182, 98 L Ed 168 (1953; *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991)); and the award requires violation of public policy (*United Paperworkers Int'l Union v. Misco, Inc.*, 484 US 29, 42, 98 L Ed 2d 286, 208 S Ct 364 (1987); *Commercial Union Insurance Co. v. Lines, et al*, 378 F 3d 2004 (2d Cir, 2004).

     A.    <u>The Arbitrator Manifestly Disregarded the Law in Rendering the Award with Respect to CUTPA</u>.

This court's opinion in *Success Systems, Inc. v. Maddy Petroleum Equipment, Inc.*, 316 F.Supp.2d 93, 96-97, 99-100 (May 3, 2004), very comprehensively discussed the earlier decisions of the Second Circuit regarding the use of the manifest disregard of the law doctrine to vacate arbitration awards. Stephens will summarize the conclusions of this court and the holdings of the Second Circuit here without recitation of the specific cites other than cross-referencing the

11

summary to the pages of the *Success Systems, Inc.,* decision.

- The doctrine is severely limited, in application. The Second Circuit's reluctance to apply the doctrine is limited "only to those exceedingly rare instances where egregious impropriety on the part of the arbitrators is apparent but where none of the provisions of the FAA apply." 316 F.Supp.2d 93, 97.

- The party seeking vacatur bears the burden of proving that the arbitrator manifestly disregarded the law. 316 F.Supp.2d 93, 99.

- Proof of a mere or simple error or failure of the arbitrator to understand the law is not sufficient. 316 F.Supp.2d 93, 99.

- The movant "must satisfy a two-pronged test that has both an objective and a subjective component."

     The objective component requires proof "that the 'governing law alleged to have been ignored by the arbitrators [was] well-defined, explicit and clearly applicable. (Cites deleted.) '" If there is more than one *reasonable* interpretation of the governing law, this test is not satisfied. .316 F.Supp.2d 93, 99.

     The subjective component looks to proof of the knowledge possessed by the arbitrators of the governing law and that they appreciated that it governed the case but still decided to ignore or defy it. 316 F.Supp.2d 93, 100.

- Vacatur is not appropriate to a manifest disregard challenge if the court "can glean 'even a barely colorable justification' for the award from the record. 316 F.Supp.2d 93, 100.

The arbitrator stated in paragraph 13 of the award certain facts that must be presumed to be the basis for his entire ruling against Stephens on Stephens' counter-demand. The Arbitrator reasoned that: Stephens read and understood the terms of the UFOC and his franchise agreement when he signed them; and Stephens was an experienced business man with "sufficient education and business acumen to make an independent judgment" as to his purchase of a TES franchise.

That presumption arises from the Arbitrator's statement in paragraph 2 of the Award

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

that his findings and awards "are applicable only to the unique relationship" between the parties "and shall not be interpreted to apply to other similar fact patterns or matters which may be in litigation or pending in arbitration." The arbitrator was well-aware of the almost identical factual and legal issues of the Zaks Proceeding, having read Stephens' comprehensive applications to consolidate both arbitration proceedings. Perhaps Zaks didn't understand the franchise documents or had less business acumen or education than Stephens, in which event the Arbitrator may have found in favor of Zaks on the identical claims were Zaks the respondent.

In effect, the Arbitrator based the entire award on the finding that Stephens did not reasonably rely on the misrepresentations of the TES Parties. The finding in paragraph 15 of the Award must be interpreted to read: "* * * none of the claimed representations, *as to Mr. Stephens*, are material, or significantly misleading, as to have caused the damages that Mr. Stephens claims." Thus, the Arbitrator manifestly disregarded the well-defined, explicit and clearly applicable law of Connecticut that a CUTPA victim need not prove whether he actually believed, relied on or reasonably relied on the misrepresentation. *Hinchcliffe v. American Motors Corp.*, 184 Conn. 607, 617, 440 A.2d 810, 815 (1981); *Izzarelli v. R. J. Reynolds Tobacco Co.*, 117 F.Supp. 167 (D.Conn. 2000). Stephens called these uncontested authorities to the attention of the arbitrator at page 41 of Stephens post-hearing brief.

The TES Parties (at pages 29-30 of their post-hearing brief) concede that Connecticut courts have "generally held that a complainant need not prove that he relied on an unfair or deceptive representation" to maintain a CUTPA action. However, the TES Parties argue

"In a case of a single individual's CUTPA claim only proof of actual reliance should be viewed as adequate proof the required materiality of the alleged misrepresentation."

This statement is unsupported by any authorities whatsoever and could not be relied upon by the arbitrator.

That argument is grossly unreasonable and would, if accepted by the courts, very seriously undermine enforcement of CUTPA. Consider the effect in this action. Stephens, who relied primarily on misrepresentations made by the TES Parties on their Web site directed to the general public and the republication of the Ashman Article, could have sought certification as a class action under § 42-110g (b), CUTPA. If Stephens had done this, certainly neither he nor the individual members of the class would be required to prove reliance. Otherwise, § 42-110g (b), CUTPA, would be meaningless. Should Stephens have a greater burden of proof under CUTPA merely because he chose not to request certification of his action as a class action § 42-110g (b), CUTPA?

The arbitrator manifestly disregarded the "well-defined, explicit and clearly applicable" governing law. *Success Systems, Inc.*, supra, l.c. 316 F. Supp. 99, citing *Westerbeke*, 304 F.3d at 209 (quoting *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986)); *see also Hoeft v. MVL Group, Inc.*, 343 F.3d 57, at 70 Stephens had no burden to prove individual reliance on the misrepresentations of the consumers targeted by the TES Web site and the Ashman Article published by the TES Parties.[9] The arbitrator, based on the express recitations of the governing law in the briefs of the Parties and his own experience as a practicing lawyer, must have known what that governing law was but specifically decided to disregard it. *Goldman v. Architectural Iron Co*, 306 F.3d 1214, 1216 (2d Cir., 2002); *GMS Group, LLC v. Henderson*, 326

---

[9]Stephens does, in fact, claim that he did reasonably rely on the misrepresentations of the TES Parties. He does not, however, have the burden of proving that reliance to be successful on his claims, as the arbitrator would impose on him.

F.3d 75, 78 (2d Cir. 2003D); *Halligan v. Piper Jaffrey, Inc.,* 148 F.3d 197, 204 (2d Cir., 1998).

If the arbitrator did intend his findings in favor of TES on Stephens' Counter-Demand to be based on justification other than the claim that Stephens didn't reasonably rely on the misrepresentations, he manifestly disregarded the requirements for proof of a CUTPA claim, as comprehensively discussed by Stephens at pages 40 - 44 of his Post-Hearing Brief, and even under the standards discussed by the TES Parties at pages 28 - 33 of their brief, by finding in favor of the TES Parties on Stephens' CUTPA claims. Award, par. 12.. Consider the following facts:

- There is only one interpretation of the claim that TES Consultants could help interested persons identify which of the thousands of different franchises being offered in the United States was right for them rather than be limited to the number of franchises available from the typical broker. TES Web Site, Exhibits 13b and 13d; *Partners in Profit* description of the TES Consultant Franchise Program, Ex. 21; and Exhibits 22 and 23. That sole interpretation is that TES already had arrangements permitting it to place its Clients with thousands of different franchises. But TES franchisees were required to select the franchise options available to their clients only from the very limited number of franchises identified in the TES library (116) with whom TES had made such arrangements. (Operations Manual, Ex. 15, Sec. 7, p. 11; TES Parties Post-Hearing Brief, Ex.9, p. 4 [Facts, Paragraphs. 8b and c]; Ex. 7.) The fact that the Consultant could, after going through certain hoops, perhaps get the TES Parties to add other franchises to the library, is immaterial. The same could be done through the "typical broker." This Franchise Inventory Misrepresentation was a serious misrepresentation to the general public and certainly a violation of CUTPA.

- Aggravating the Franchise Inventory misrepresentation was the "Lead Pool" scheme that TES admitted promoting. (TES Parties Post-Hearing Reply Brief, p. 4 [par. I-d]). Under this scheme, Clients were limited to only about eight or nine franchise options.

- The TES Parties admitted to publicizing certain substantial incentives offered by some of its approved franchises to TES Consultant Franchisees to "place" Clients with their franchises. What was the purpose of publishing this information if the TES franchisees were to recommend franchises based only on the best interest of their clients?

- Certain information was to be elicited from prospects on a confidential basis from which a DISC profile analysis would be generated, supposedly for the benefit of the prospect. But certain pages of this DISC profile would be marked "Internal Use Only" and delivered only to the TES Franchise Consultant. These Internal Use Only pages were to be used only by the Consultant to help him work successfully with the prospect in helping select a franchise and

coach franchisor marketing representatives how to do the same. (Operations Manual, Ex. 15, Sec. 8. In the TES Parties printed outline to its Consultant Franchisees regarding their "5th Meeting" with a Client, the franchisees were instructed: **"Note: Do not tell your Client that you have been speaking to the franchisor rep unless asked. If asked, simply say, 'Yes'."** (Ex. 24.) (Emphasis in original.)  The TES Parties repeatedly tell the public in franchise marketing literature that TES "will represent our clients' interest above all others" and that "Your Success is Our Only Business." (Ex. 13d, for example)  None of these activities have any goal, however, other than to sell franchises, notwithstanding the best interest of the TES Clients. These misrepresentations are unquestionably violations of CUTPA.

• The TES Parties admitted that they distributed to prospects information based on a U.S. Department of Commerce survey touting the safety of investing in a franchised business as compared to an independent business that they knew was based on the length of time a business was in operation without regard to the number of owners of that business during the measured period. This is unquestionably a meaningless statistic. A prospect is interested in how long he/she will be in business, not how long that business will be in operation. Nevertheless, knowing that the information was deceptive, the TES Parties continued to publish it and encourage its consultant franchisees, including Stephens, to do the same. Much to do was made in the TES Parties' briefs about the republication of this information by the industry and other sources who quite obviously were relying on the fact it was generated by the U. S. Department of Commerce and had not made a critical analysis of it. The arbitrator completely ignored TES's admission of publishing this grossly deceptive information to convince prospects of the dramatic increased safety they were getting in their franchise investments, compared to investing in independent businesses.[10]

The arbitrator manifestly ignored, in rendering his award, all of the foregoing evidence that was available through the extensive testimony and exhibits produced in this proceeding. Manifest disregard of evidence is not grounds for vacatur, but this court can most certainly consider the evidentiary record

> * * * for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law.

---

[10]Stephens does not contest the claim that, generally speaking, investing in a franchised business is probably safer than investing in an independent business. There are no statistics whatsoever, however, to substantiate the dramatic claims made by the TES Parties, and none are cited by the TES Parties. See, for example: the TES Parties' Post-Hearing brief, pp.11-17; and the TES Parties Post-Hearing Reply Brief, pp. 4-5.

*Wallace v. Buttar,* 378 F.3d 182, 193 (2d Cir. 2004). Stephens urges that, if the court finds that the the TES Parties violated CUTPA in any of the foregoing examples of evidence manifestly ignored by the arbitrator, it must be determined that he ignored the well-defined, explicit and clearly applicable Connecticut law represented by CUTPA.

Further, in no way can the arbitrator explain he found that Stephens should not have reasonably relied upon the misrepresentations that are the focus of the foregoing discussion of evidence manifestly ignored based upon his reading and understanding of the franchise documents. This finding is arbitrary and capricious.

B.    The Arbitrator Manifestly Disregarded the Law in Rendering the Award with Respect to Applying § 817.416(2)(a) of the Florida Franchise Act.

Stephens' claim that the arbitrator manifestly disregarded the law in applying § 817.416(2)(a) of the Florida Franchise Act must be determined under the same principles as stated for his identical claim for CUTPA violations in paragraph A immediately preceding.

The Florida Franchise Act, Fla..Stat. § 817.416, provides that it is unlawful, when selling or establishing a franchise or distributorship, for any person to "1.    Intentionally to misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship ; * * *." Florida Franchise Act, § 817.416 (2)(a)1. For the reasons previously stated in Paragraph A immediately preceding, it must be presumed that the arbitrator found against Stephens on his claim under the Florida Franchise Act because of the sophistication, education and experience of Mr. Stephens and the fact that he admitted to reading and understanding the UFOC (Ex.25) and the franchise agreement (Ex.26) when he signed them.

Neither the UFOC  nor the franchise agreement support any claim that Stephens

should not have relied on the claims made by TES by distributing the Ashman Article. The only

portion of the UFOC that may be relevant is Item 19 (on p. 22 of the UFOC), entitled "Earnings

Claims, which specifically states:

> We do not furnish or authorize our sales persons to furnish any oral or written information concerning the *actual or potential sales, costs, income or profits* for a Franchised Business. Actual results vary from unit to unit and we cannot estimate the results of any particular franchise. (Emphasis supplied.)

The only portion of the franchise agreement that may be relevant is the acknowledgment in section

24.01 (a) (on page 34):

> 24.01  Consultant Franchisee acknowledges, warrants and represents to Franchisor that, except as may be provided in this Agreement or Franchisor's Uniform Franchise Offering Circular:

> (a) No representation has been made by Franchisor (or any employee, agent or salesman thereof) and relied upon by Consultant Franchisee as to the *future or past income, expenses, sales volume or potential profitablity* of the business franchised hereby, or any other business franchised by Franchisor. (Emphasis supplied.)

The Ashman Article reference to the Department of Commerce Survey is directed at

convincing readers that franchised business are *much safer investments than independent businesses*.

The TES Parties used that survey to convince prospects that reliable statistics prove that over 90%

of franchised businesses remained in operation after ten years while only 18% of independent

business remained in operation during that same period of time.

Stephens agrees that franchised businesses are probably safer investments, on the

whole, than independent businesses. However, his complaint arises out of the knowingly deceptive

use of the meaningless Department of Commerce Survey by the TES Parties to convince himself and

other prospects of an extremely dramatic advantage of investing in a franchised business over

investing in an independent business. This is an intentional misrepresentation of the prospects or

chances for success of his proposed franchise in violation of Florida Franchise Act, § 817.416 (2)(a)1, the well-defined, explicit and clearly applicable law of Florida.   None of Stephens' franchise safety claims had anything to do with "the *actual or potential sales, costs, income or profits*" or "the *future or past income, expenses, sales volume or potential profitablity*" of his proposed TES franchise, as comprehended by the disclaimers, etc., in his franchise documents,  only the "prospects or chances for success" of investing in that business.   The arbitrator thus manifestly disregarded the Florida Franchise Act in making the award.

C.   <u>The Arbitrator Was Evidently Partial in Rendering the Award in violation of 9 USCA</u>
<u>§ 10 (b)</u>.

An arbitration award may be vacated by the United States District Court in and for the district wherein the award was made "Where there was evident partiality * * * in the Arbitrators." 9 USCA § 10 (b).  This court is the appropriate court to rule on this issue.

The Second Circuit discussed the "evident partiality" issue in *Morelight Construction Corp. v. New York City District Council, Carpenters Benefit Funds*, 748 F.2d 79, at page 84 (2nd Cir.1984), stating:   "we hold that 'evident partiality' within the meaning of *9 U.S.C. § 10* will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."   Stephens presents very strong and convincing evidence of "evident partiality" that would lead a reasonable person to conclude that the arbitrator was partial to the TES Parties. That evidence will be discussed subsequently in this Paragraph C.   Stephens presents this evidence here to prove that there is no colorable basis for the TES Parties to claim a lack of evident partiality, not to reargue issues before the court that were presented to the arbitrator.  See, for example, *Wallace v. Buttar*, supra.

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

1.    <u>The Arbitrator Manifestly Disregarded the Law</u>.    The evidence previously discussed regarding the arbitrator's manifest disregard of CUTPA and the Florida Franchise Law should also be considered in determining "evident partiality."

2.    <u>The Arbitrator Wrote the Award as an Advocate, Not as a Neutral Party</u>. The Arbitrator misstated, in paragraph 13 of the award, that Stephens "now claims that he misunderstood the intention of the TES franchise business * * * ."  Stephens very emphatically and consistently claimed that the TES Parties misrepresented the nature of the TES business to him, not that he "misunderstood" any of those representations.  See, for example:  Paragraph 13 of Stephens Complaint, Doc. No. 1, which was attached to his Counter-Demand (Ex.2); and the entire Stephens Post-Hearing Brief (Ex.8).  At no time during the proceeding did the TES Parties themselves claim that *Stephens claimed* he "misunderstood" their representations.  This was an apparently calculated misstatement of Stephens' counter-demand evidencing "an attitude or disposition" favoring the TES Parties in an effort to buttress the arbitrator's irrational and arbitrary award.   The dissenting opinion of Justice Fortas in *Commonwealth Coatings Corp. v. Continental Casualty Co., et al,* 393 U.S. 145, ___, 89 S.Ct. 337, 21 L.Ed.2d 301, is enlightening here.  "* * * .  'Evident partiality' means what it says: *conduct – or at least an attitude or disposition -- by the Arbitrator favoring one party rather than the other.*"  (Emphasis supplied.)

3.    <u>The Arbitrator Manifestly Disregarded the Evidence</u>.  The arbitrator's manifest disregard of critical evidence (supra, paragraph IV-B)  should also be considered in determining "evident partiality."  'Paragraph three of the award finding against Stephens in every respect on his counter-demand was based entirely on the fact that Stephens was an experienced and well-educated person who had read and understood the TES UFOC and his franchise agreement

before he signed the franchise agreement. This finding presumes that somewhere in those franchise documents, which were exhibits in the record, were facts negating each and every one of Stephens' claims. The record, minimal as it may be in this proceeding, indicates otherwise.

    4.   The Arbitrator's Award Finding That It Was Not the Fault of the TES Parties That Stephens' Moral and Ethical Principles Were Not In Accord With the General Belief System of the TES Parties Condones Conduct That Violates the Public Policy of Connecticut.

    The arbitrator stated in paragraph 13 of the Award the fact that Stephens now claims "that he was not morally and ethically in accord with the general belief system of the TES Franchise business is not the fault of Claimant." In other words, Stephens, should simply have gone along with all the misrepresentations of which he complains, such as those of record described in the bulleted paragraphs on pages 15 - 16 this Memorandum. By doing so, Stephens himself would be violating CUTPA and the Florida Franchise Act, committing fraud, and violating what he believed to be fiduciary relationships with his clients. Such an expectation would require him to violate the public policies of both Connecticut and Florida. Had the arbitrator gone further and found him liable in damages for terminating his franchise relationship for this reason, the award would certainly be unenforceable for violation of public policy. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42, 98 L.Ed.2d 286, 108 S.Ct. 364 (1987); *In the Matter of the Arbitration Between Andros Compania Maritima, S. A. (etc.) and Marc Rich & Co., A.G. (etc.)*, 579 F.2d 691, 699 (2d Cir. 1978); *Commercial Union Insurance Co. v. Lines,* 378 F.3d 2004, 2009 (2d Cir. 2004). The mere fact that the arbitrator expected Stephens to continue these practices "in accord with the general belief system of the TES Franchise business" is strong evidence of evident partiality.

    *5.*   The Arbitrator's Reference to the Success of the TES Franchise System is a Gross Misstatement of the Evidence. Paragraph 14 of the award states:

    TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

14. There was substantial testimony and significant proof of record to indicate that the franchise system or product sold by the Claimant is a workable product and that other franchisee's have had success in purchasing and using the products and services of the franchise system.

Only one TES franchisee testified in support of this claim, Wilt Jones. TES Parties Post-Hearing Brief, pp. 11,13, 20 and 23. Stephens is puzzled by the arbitrators reference to "substantial testimony" and "significant proof" referred to by the arbitrator.

However, there was very substantial testimony and significant proof to the contrary that the arbitrator manifestly disregarded. TES claimed that it had awarded a total of 417 franchises from its inception in 1997 through February 4, 2005.[11] (TES Post-Hearing Brief, Ex. 9, p. 17.) Of these 417 franchises, at least 209 had been sold during 2003 and 2004.[12] TES admitted that approximately 105 franchises had been terminated through February 4, 2005. (TES Reply brief, Ex. 11, p. 5.) Stephens urges it is a fair assumption that the great bulk of these terminations occurred with respect to the not more than 208[13] franchisees who purchased prior to January 1, 2003. In any event, when a franchisee is terminated, as opposed to when the franchisee sells his/her franchise, the franchisee loses his entire investment in that franchise. Initial franchise fees alone were at least $29,500 (See the face page of the May 26, 1999 TES UFOC [Ex. 25]) , and these franchisees certainly had substantial additional investments of money, time and effort in these franchises. This

---

[11]This statistic was based on data in TES UFOCs that had been admitted as exhibits, the last of which, a March 18, 2005, UFOC, contained data on franchisees through February 4, 2005.

[12]See the data for sales of TES consultant franchises in the Franchise Reports attached as Exhibit B to the TES Post-Hearing Brief, Ex. 9. There were 92 franchises sold between January 1 and December 6, 2004, and 117 in 2003. There was no evidence in the record as to how many franchise were sold between December 6, 2004, and February 4, 2005.

[13]417 total franchisees, reduced by at least 209 purchased during 2003 and 2004, equals 208.

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

is not a record of a successful franchise system. It further exemplifies how deceptive TES's claim is that 90% of franchisees remain in business after ten years!

Here again, in referring to the success of the franchise system, the arbitrator completely ignores Stephens' complaint that he left the TES System because he was not ethically in accord with the practices of the TES System, not because it didn't work. It made no difference to the arbitrator whether the system was ethical or legal. It worked. This is an en evidently partial attitude.

**D.    THE APPROPRIATE RELIEF TO STEPHENS, IF THE COURT ORDERS VACATUR, IS REMAND TO A NEW ARBITRATOR FOR REHEARING.**

If the court orders vacatur, Stephens very reluctantly requests remand with directions for rehearing before a new arbitrator. Needless to say, these litigation and arbitration proceedings have been expensive to Stephens. The cost of what will probably be another four days of hearings, travel, etc., are not small. But, as stated in this Memorandum, Stephens is convinced that Mr. De Barbieri is evidently partial in favor of the TES Parties for some reason beyond the facts and legal issues involved in this controversy. He has no confidence in the willingness or ability of Mr. De Barbieri to fairly reconsider all these facts and issues on remand. As an arbitrator, he has too much power to call his own shots, knowing the very limited power the courts have to review his award.

**V.    CONCLUSION.**

The record of this hearing very emphatically demonstrates that:

A. the arbitrator manifestly disregarded the well-defined, explicit and clearly applicable law of Connecticut, most particularly, CUTPA: by imposing on Stephens the individual burden of proving reasonable reliance on the misrepresentations of TES; and by not applying CUTPA to the undisputed evidence of the commission of those misrepresentations by TES, as to which TES

TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd

offered no colorable evidence to the contrary

   B. The arbitrator manifestly disregarded the well-defined, explicit and clearly applicable law of Florida, most particularly Fla..Stat. § 817.416, the Florida Franchise Act, in that the undisputed evidence was that TES misrepresented the prospects or chances for success of any franchised business, which necessarily included that Stephens was proposing to and did purchase, and there was no colorable evidence to the contrary.

   C. A reasonable person would most certainly conclude that the arbitrator was evidently partial to TES, based on the following: his manifest disregard of the laws of Connecticut and Florida, as previously stated; his attitude or disposition favoring TES, as evidence by his misstatement of facts in the Award; his manifest disregard of uncontested evidence favoring Stephens; his stated expectation that Stephens should have violated the public policies of both Connecticut and Florida by carrying out TES's misrepresentations, etc., in dealing with his Clients; and by grossly exaggerating the value of and misstating the evidence offered by TES.

   There is only one conclusion. The award with respect to Stephens Counter-Demand must be vacated.

Respectfully submitted
By His Attorneys:


John Q. Gale        Mark J. Klein
Federal Bar #ct05206     Federal Bar #ct23210
GALE & KOWALYSHYN, LLC  MARK J. KLEIN, P.C.
363 Main Street, 4th Flooor   1102 Grand Blvd., Ste. 1102
Hartford, CT 06106     Kansas City, MO 64199-3471
Tele (860) 522-8296    Tele (816) 474-6137
Fax (860) 522-8298    Fax (816) 474-0207

    TBS\Plead-Nondisc-TBS\Mtn to Vacate - Support.LM1.wpd